## MINERALS SEPARATION NORTH AMERICAN CORPORATION v. MAGMA COPPER CO.

District Court, D. Maine, S. D. February 3, 1928.

No. 800.

1. Patents ⟝327(19)—Court should follow decision of Circuit Court of Appeals in another circuit, involving validity of same patent, unless error clearly appears, though parties were not same.

Court should follow decision of Circuit Court of Appeals in another circuit, involving validity of same patent, even though parties were not the same, unless manifest error clearly appears.

2. Patents ⟝328—962,678, claims 1 and 2, for process of concentrating ores, held valid and infringed.

Patent No. 962,678, claims 1 and 2, for process of concentrating ores, which consists in mixing powdered ore with water containing in solution small quantity of mineral-frothing agent, agitating mixture to form froth, and separating froth, held valid, and infringed by process which used compressed air in place of agitation by mechanical means.

3. Patents ⟝328—962,678, claims 1 and 2, for process of concentrating ores, held broad enough to cover any pulp, whether acid, alkaline, or neutral.

Claims 1 and 2, patent No. 962,678, for process of concentrating ores, which consists in mixing powdered ore with water containing in solution small quantity of mineral-frothing agent, agitating mixture to form froth, and separating froth, are not limited to an acid pulp, but are broad enough to cover any pulp, whether acid, alkaline, or neutral.

4. Patents ⟝157(1)—Where terms of patent are plain, and intention of parties clearly manifest therefrom they must prevail.

Patent is a contract between government and patentee, and rule for construction of contracts generally controls in its interpretation, and when its terms are plain, and intention of parties clearly manifest therefrom, they must prevail.

In Equity. Patent infringement suit by the Minerals Separation North American Corporation against the Magma Copper Company. Decree for plaintiff.

Thaxter & Holt, of Portland, Me. (Sidney St. F. Thaxter, of Portland, Me., and Henry D. Williams, Wm. Houston Kenyon, Lindley M. Garrison, and Harry C. Lewis, all of New York City, of counsel), for plaintiff.

Woodman, Whitehouse, Skelton & Thompson, of Portland, Me. (Albert S. Woodman, of Portland, Me., and William H. Davis, John F. Neary, and Merton W. Sage, all of New York City, of counsel), for defendant.

PETERS, District Judge. This suit, originally begun with two plaintiffs and involving patent No. 835,120, as well as patent No. 962,678, has resolved itself, after various amendments and the filing of supplemental bills and answers, into a suit by the Minerals Separation North American Corporation against the Magma Copper Company for infringement of patent No. 962,678, and, by virtue of the pleadings, involves both the validity of that patent and the question of infringement. Claims 1 and 2 only are in issue, claim 1 being as follows:

"The herein described process of concentrating ores, which consists in mixing the powdered ore with water containing in solution a small quantity of a mineral-frothing agent, agitating the mixture to form a froth, and separating the froth."

Claim 2 is identical with claim 1, except that the mineral-frothing agent is described as "organic"; but, as practically all mineral-frothing agents are organic substances, this need not be considered. Patent No. 835,120 is the noted mineral froth flotation patent that has been much litigated in different circuits and has been before the Supreme Court twice. Minerals Separation, Ltd., v. Hyde, 242 U. S. 261, 37 S. Ct. 82, 61 L. Ed. 286; Minerals Separation, Ltd., et al. v. Butte, etc., Co., 250 U. S. 336, 39 S. Ct. 496, 63 L. Ed. 1019. Patent No. 962,678, the one now in suit, has been before the District Court of Delaware and the Court of Appeals of the Third Circuit, and by both courts held valid. Minerals Separation, Ltd., v. Miami Copper Co. (C. C. A.) 244 F. 752; Minerals Separation, Ltd., v. Miami Copper Co. (D. C.) 237 F. 609.

It appears that the invention covered by the patent in suit has been for many years in quite universal use in the business of concentrating copper and zinc ores, and has been largely accepted in that industry as solving in a practical way a previously unsolved and perplexing problem. It is stated in the plaintiff's brief that its use is "enormous" and world-wide. In spite of the extraordinarily heavy burden resting upon the defendant to overcome the presumption, arising from the decisions in the Third Circuit, the general recognition of commercial utility, and the fact that letters patent have issued, the able counsel for the defendant have, with apparent confidence, interposed notable and impressive defenses to the bill of complaint. A careful and somewhat long-continued consideration of the voluminous evidence has led me to the conclusion that the fundamental difference between the parties is in their point of view of the subject-matter of the two patents, and that a determination of the correct viewpoint, if it can be reached, will go a long way toward settling the applicability and value of the arguments on the one side and the other.

Owing to the grounds upon which this decision is based, and the fact that the circumstances and the arguments affecting the two patents, as well as the great amount of literature concerning the subject, will be familiar to any one who will probably have occasion to read this opinion, it will be necessary only to outline the general field of dispute.

Prior to the invention embodied in patent No. 835,120, hereafter called the first patent, it was well known in the art of flotation concentration, as stated by the Supreme Court in the Hyde Case, "That oil and oily substances had a selective affinity or attraction for, and would unite mechanically with, the minute particles of metal and metallic compounds found in crushed or powdered ores, but would not so unite with the quartz, or rocky nonmetallic material, called gangue." Prior to the first patent, many different processes of concentration were tried, with more or less success, based upon and endeavoring to utilize this known "preferential affinity" of oily substances for mineral particles in a mixture of ground ore and water. In the Hyde Case the Supreme Court clearly considered the first patent as a process patent, based upon "this mysterious affinity of oil for the metallic particles of the ore," whereby the metallic particles were coated with a thin film of oil. That patent was held by the court to represent a striking advance in the art, turning previous "failure into success."

Into this field, with the process of the first patent as a part of the prior art, came the patentees of the second patent, the patent in suit, with an undoubted improvement; a process not dependent upon the oily coating of the mineral particles, but utilizing a hitherto unknown property of mineral-frothing agents in solution to form air bubbles which attract and attach themselves to the uncoated and unoiled mineral particles. It should be said, however, that the defendant attacks the accuracy of the above general statement, and maintains that it is not true that in the process of the second patent the

mineral-frothing agent in solution forms bubbles which attach themselves to *uncoated* mineral particles. It says that, while the frothing agent goes wholly into solution in the water of the "pulp," a small part of it comes out again by "adsorption," and does coat, minutely, the mineral particles, so that it is the same process with a different agent. This is a region of disputation, where experts and scientists occupy the field alone. They have battled valiantly, but with the result that I cannot say that I am convinced that the "adsorption" theory has any practical applicability here.

The defendant asserts with some force that the process of the second patent, at most, is nothing more than the process of the first patent, with the substitution of a soluble for an insoluble frothing agent; that it involves no patentable invention, and is void for anticipation. The defendant attacks claims 1 and 2 as too indefinite, in that they claim a monopoly on the basis of a quality (solubility), which quality does not measure the availability of the substances for flotation purposes.

The plaintiff avers that the claims are not based on solubility, but on the mineral froth-forming quality of an agent in solution, and, regarding both patents as process patents, as distinguished from patents for agents, points to the different principles of action in the two processes. The processes of the two patents are undoubtedly alike in this: That they can be carried out by the use of the same apparatus with the same manipulation. But the principle of action, so far as it is known, involved in the process in suit, is not the preferential affinity of the frothing agent used for the mineral particles, or the coating of those particles, or the attachment of air bubbles to coated particles, as in the first patent, because the frothing agent goes into solution without coating either mineral or gangue, and the law of attraction and attachment of air bubbles to oil-coated mineral particles cannot apply. The process in suit, as it is put by counsel for plaintiff in their brief, "proceeds by reason of the peculiar character of the air bubbles produced in water, modified by the presence of the dissolved mineral-frothing agent employed, and by reason of the attraction and attachment of such air bubbles for uncoated metalliferous mineral particles."

I consider that the decisions of the Supreme Court in the Hyde Case and in the Butte Case, above mentioned, are in harmony with the position of the plaintiff, rather than with that of the defendant. The court evidently regarded the first patent as a process patent, limited to the use of oil or oily substances. In the Butte Case, involving the first patent, the court confirmed to the patentees their process claims, involving the use of any of the class of oily (insoluble) mineral-frothing agents that acted by preferential affinity in coating the mineral. By implication it confirms to the patentees here their process claims, involving the use of any of the class of soluble mineral-frothing agents that act on the different principle of going into solution, not coating the mineral, but modifying the water in some unknown way, to accomplish the same result in the end; i. e., bringing up to the surface the mineral particles attached to the froth.

[1] It can be said of this process, as was said of the process by the court in the Butte Case, that "the patentees discovered the described process for producing the result or effect, the metal-bearing froth, but they did not invent that result or froth. Their patent is on the process; it is not and cannot be on the result, and the scope of their right is limited to the means they have devised and described as constituting the process." It seems to me that the principal defenses must fail, for the reason that they are based on a theory of difference between the two patents that apparently would not be accepted by the Supreme Court, according to my interpretation of its two decisions. But, however that may be, these and the other more technical defenses were doubtless considered by the Circuit Court of Appeals in the Third Circuit in the suit of Minerals Separation, Ltd., v. Miami Copper Co., 244 F. 752, involving the validity of this same patent, and, while the parties were not the same, I am practically required to follow that decision, based upon substantially the same facts, unless manifest error clearly appears. The precedents in this circuit are very strong to that effect. In Beach v. Hobbs et al., 92 F. 146, 147, Judge Colt, for the Circuit Court of Appeals, said:

"Although the defendants in this case are not the same, or in privity with the defendants in the other cases, we think, as a general rule, and especially in patent cases, we should follow the decision of the Circuit Court of Appeals of another circuit upon final hearing with respect to the issues determined, if based upon substantially the same state of facts, unless it should clearly appear that there was manifest error."

Judge Putnam, in Hatch Storage Battery Co. v. Electric Storage Battery Co.

(C. C. A.) 100 F. 975, 977, had previously said:

"We are saved, by the amount of judicial literature relating to the subject-matter of this case, from doing much more than giving our conclusions. Indeed, it is not even necessary to fully recite the claims, as the patent is found at length in Electrical Accumulator Co. v. Brush Electric Co. [52 F. 130], 1 U. S. App. 320, decided by the Circuit Court of Appeals for the Second Circuit, the opinion having been rendered by Judge Shipman. * * * The validity of claims 1, 2, 3, 6, 7, and 12 of the patent in issue was fully sustained. That covers all in issue here, except 9 and 10. The case was very elaborately considered. The decision has never been judicially overruled, doubted, or qualified. Therefore, on the principles which we have stated, although it was against a different respondent from that at bar, it must be accepted as conclusive on this appeal as to the validity of claims 1, 2, 3, and 12."

In Pratt v. Wright et al. (C. C.) 65 F. 99, Judge Wallace said:

"The questions are fairly doubtful; and, that being so, it would be unseemly not to follow a decision which is entitled to the greatest respect, made by a court of co-ordinate jurisdiction, and determining the title to the same property."

I think no one who studies the evidence, the diametrically opposed theories of the experts, and the elaborate arguments in this case can say conscientiously that it "clearly appears that there was manifest error" in the decision of the Circuit Court of Appeals in the Third Circuit. The most that can be said seems to me to be that possibly other minds might take a different view of the fundamental difference between the two patents, in which case, unless the decisions of the Supreme Court are construed to impliedly prevent, arguments of defendant's counsel, based on anticipation and nonpatentability, would be very persuasive. However, that possibility is far from a situation justifying me in departing from the previous decision, and consequently, for me, "it would be unseemly not to follow a decision, which is entitled to the greatest respect, * * * determining the title to the same property."

[2-4] It follows that the patent is held valid.

It seems quite clear that the claim of noninfringement should be decided against this defendant.

The operation of the defendant's mill and the process described in the patent in suit are substantially alike, except that the defendant's pulp is alkaline, and not acid, and

a further difference claimed by the defendant in the matter of agitation of the pulp, in that any agitation affecting its pulp is produced by air introduced under pressure, sometimes spoken of as pneumatic agitation, and not by any mechanical or obviously violent means, to which the defendant claims the plaintiff is limited. There is a difference, also, in the size and appearance of the bubbles in the two processes, but not, apparently, in their accomplishment.

By reason of these differences the defendant denies infringement.

The specification of the patent does not disclose how to carry on the process, or that it can be carried on except in an acidified pulp.

Claims 1 and 2 in question are not limited to an acid pulp, but are broad enough to cover any pulp, whether acid, alkaline, or neutral.

The defendant's position is that claims 1 and 2 are void, because they attempt to claim more than the patentees had discovered or disclosed in the specification, and are not infringed, because the claims, based upon the invention disclosed in the patent, must be limited to the carrying of the process in an acidified pulp, while the defendant's pulp is alkaline. In other words, this defense is that the claims in issue are void, because they are not limited to acidified pulps, and that the defendant does not infringe, because it does not use an acidified pulp.

It is apparently true that the inventors disclosed an acid pulp, and did not know that the process could be used otherwise. It was widely understood at that time that nothing but an acid process would work in their concentration process, and it was the general custom to use an acidified pulp. This, however, was not a part of the contribution by the patentees to the flotation art. What they contributed was a process of froth flotation employing a mineral-frothing agent in solution. Even if the patentees did not know that the process described by them could be carried on with an alkaline pulp, they did not limit themselves in that respect, and it is sufficient if the real novelty of their invention is broad enough to support the claims, as it appears to be.

This matter, however, was covered by the decisions in the Miami Case in the Third Circuit, which I have already indicated, in my opinion, should bind me in the situation as I find it disclosed. The court there, in deciding adversely to similar contentions, adverted to the matter of acid in the pulp as follows:

"We may also note that, while the addi-

tion of an acid to the mineral-frothing agent is described as part of the process, this was at that time a usual practice, and in any event is not an element in the claims now in issue."

Counsel for defendant here say that we have not the evidence in the Miami Case before us, and that for all it appears the defendant in the Miami Case may have used an acid pulp; but I find, on page 631 of the opinion of Judge Bradford in that case ([D. C.] 237 F. 609), a statement that the defendant "does not use acid in its process." The claims in issue, there as here, were claims not limited to an acidified pulp. So claims 1 and 2 here, not being limited to acid processes, being valid, are infringed by the defendant's alkaline process.

It remains to consider the position of the defendant that "the claims are not infringed by the defendant's process, because the claims were deliberately limited by the patentees to the agitation froth process—i. e., a process in which the froth is formed by agitation—and the defendant uses the pneumatic flotation process in which the froth is not formed by agitation."

The defendant's statement of this matter of defense, as above quoted, involves a characterization of the plaintiff's process as "the agitation froth process" and the statement of fact that in the pneumatic process, used by the defendant, "the froth is not formed by agitation." If by that description of the plaintiff's process is meant one whereby the froth is formed by agitation, as contrasted with a process where the froth is formed otherwise than by agitation, the characterization is apparently accurate and without ambiguity. The plaintiff's process comprises three essential parts: (1) Mixing the powdered ore with water containing in solution a frothing agent; (2) agitating the mixture to form a froth; and (3) separating the froth. The process is undoubtedly an agitation froth process. The claim limits it to an agitation froth process, with no limitations on the kind of agitation.

Upon the evidence, however, I am unable to agree with the statement that in the defendant's process—the alleged infringing process—the froth is not formed by agitation. The evidence of the process, its exemplification by the experiments in Boston for the benefit of the court, and common-sense reasoning from known facts, point conclusively to the contrary. The defendant's process is the Callow cell process, using a tank with a canvas or porous bottom, through which air under pressure is forced into the pulp body contained in the tank. In this way myriads of small air bubbles are formed throughout the liquid mass, and finally accumulate at the surface in the form of froth, bearing the minute particles of mineral. From actual observation of the process, as well as otherwise, I am convinced that the froth is formed by the agitation induced by the compressed air liberated in the mixture through the porous bottom; that is to say, by the agitation in combination with the frothing agent, which always has to be present. One is as important as the other.

In the trial of the case this particular defense of noninfringement appeared to be based, not so much on an agitation process, as it was on mechanical agitation as against pneumatic agitation. It can hardly be claimed that there is not agitation in both processes. The mechanical agitation is apparently more violent, but may not be more pervasive than the agitation caused by compressed air. At least each is effective for the purpose, and I think it cannot be successfully claimed that frothing would take place without one or the other.

Patent No. 835,120, called the first patent above, being the patent that required the use of oil, is the patent that features the mechanical agitation, which was required to be of considerable intensity and duration to disseminate the minute amount of oil throughout the mixture. In any soluble frothing agent process, less agitation would be required, as the agent tends to disseminate itself. The agitation in the defendant's process is caused by compressed air let into the pulp. The question is simply whether the claims in the patent in suit are broad enough to cover that method of agitation. It would seem that the question answers itself, because the language is "agitating the mixture to form a froth." I can see no reason why the language should not receive its ordinary, natural meaning, and be construed like the language of any contract. Its terms are perfectly plain and unambiguous. As was said by Judge Anderson in I. T. S. Rubber Co. v. Essex Rubber Co. (D. C.) 270 F. 593, 600, quoting from the Circuit Court of Appeals of the Eighth Circuit: "A patent is a contract between the government and the patentee, * * * and the rule for the construction of contracts generally controls in its interpretation, and when its terms are plain, and the intention of the parties clearly manifest therefrom, they must prevail."

This doctrine is stated in O'Brien-Worthen Co. v. Stempel (C. C. A.) 209 F. 847, also quoted by Judge Anderson:

"The specification and claims of a patent constitute a contract between the United States and the patentee, and they are to be read and construed together in the same way and by the same rules by which other contracts are interpreted. The specification, which forms a part of the same petition or application as the claims, must be read and interpreted with them, not for the purpose of limiting, or of contracting, or of expanding, the latter, but for the purpose of ascertaining from the entire agreement, of which each is a part, the actual intention of the parties."

I can find no satisfactory foundation for the defendant's theory that the words in the claims, "agitating the mixture to form a froth," have any special or recognized significance to one skilled in the art, or that the words carry back to the agitation froth process of patent No. 835,120, and exclude other froth-flotation processes.

Indeed, this construction is negatived by the very language of the defendant in stating this "seventh defense," where it is said that the claims (1 and 2) were limited to "the agitation froth process; i. e., a process in which the froth is formed by agitation." That is what I find it to be, that and nothing less, and that, by the plain meaning of the language, covers agitation to form the froth, whether caused by stirring with a paddle or stirring with compressed air. In both cases air is introduced into the mixture, and has to be, to make it froth. As was said by Prof. Taggart, expert witness for defendant, in an article he wrote on the subject before he was connected with the case, "the only difference is in the method of introducing air."

I find that the defendant's process in this respect also is fairly covered by the plaintiff's claims, and is an infringement.

Both the plaintiff and the defendant here claim to be supported in their positions on this matter of infringement under the seventh defense by the opinion of the court in the Third Circuit in the Miami Case.

That case did not necessitate the decision of the point here in issue, because the defendant there used the mechanical agitation emphasized in the first patent in connection with the pneumatic Callow cell process.

The court certainly did use some expressions which indicated that it would not have considered the agitation of the Callow cells alone the equivalent of the violent agitation of the first patent (patent 835,120, and not the patent in suit). But it did not pass upon the question whether the use of the Callow cell alone, without other agitation, would be an infringement of either patent. On the contrary, it expressly negatived any such intention in these words:

"While we are loath to omit from our consideration and judgment anything affecting this very important patent and the art to which it relates, we feel, nevertheless, that we cannot consider and adjudge with propriety or authority a process with respect to which the plaintiff has had no opportunity to produce testimony, and which was not embraced in the decree we are reviewing."

It follows that the bill is sustained, and the plaintiff entitled to appropriate relief.