## Case No. 18,019.

### WOODWORTH v. SHERMAN.

### SAME v. CHEEVER et al.

[3 Story, 171; 7 Law Rep. 279; 2 Robb, Pat. Cas. 257.] [1]

Circuit Court, D. Massachusetts. May Term, 1844.

PATENT FOR PLANING MACHINE — INJUNCTION AGAINST INFRINGEMENT—EXTENSION OF TERM—GRANT TO ADMINISTRATOR—PREVIOUS ASSIGNMENT—SECURITY FOR COSTS.

1. Where a bill in equity was brought for an injunction against the defendants, to restrain them from using and selling a planing machine, constructed according to the specification in the plaintiff's patent—it was *held*, that, after the lapse of time which had occurred, since the patent was granted, taken together with the other circumstances of the case, the affidavit of a single witness was not sufficient to outweigh the oath of the patentee, and the general presumption arising from the grant of the letters patent.

[Cited in Allen v. Blunt, Case No. 217.]

2. The patent act of 1836 [5 Stat. 117] authorizes the granting of an extended term of a patent to an administrator, as well as to the patentee.

[Cited in Pierpont v. Fowle, Case No. 11,-152.]

3. The assignee or grantee, under the original patent, does not acquire any right under the extended patent, unless such right be expressly conveyed to him by the patentee.

[Approved in Wilson v. Rousseau, Case No. 17,832; s. c. 4 How. (45 U. S.) 704; Wood v. Michigan South. R. Co., Id. 17,957; Jenkins v. Nicholson Pav. Co., Id. 7,273; Johnson v. Wilcox & Gibbs S. M. Co., 27 Fed. 690.]

4. In this circuit the practice in patent cases has not been to require the plaintiff to give security for costs.

These were bills in equity, filed in the circuit court of the United States, in this dis-

1 [Reported by William W. Story, Esq. 7 Law Rep. 279, contains only a partial report.]

trict, to obtain injunctions against the defendants [Abraham P. Sherman, William A. Cheever, and eighteen others] in twenty suits, to restrain them from using or selling any planing machine, constructed substantially according to the specification under William Woodworth's patent. See the case of Washburn v. Gould [Case No. 17,214]. The complainants produced affidavits, stating that the several defendants were using a planing machine, substantially the same in its construction and mode of operation as the machine of James Gould of Charlestown, and the bill, among other things, averred, that the plaintiffs had already recovered a judgment in an action at law, against the said Gould, for the use of his machine. Various points were relied on in answer to the motion for an injunction. It was contended: (1) That Woodworth was not the sole inventor, but that one Dunbar was a joint inventor with him. (2) That the act of congress did not authorize the granting of the extended term of the patent to an administrator, but only to the patentee. (3) That some of the defendants had purchased rights under the original patent, and that, by virtue of the act of congress, the same interest that they had in the original patent enured to them in the extended patent.

B. R. Curtis, for plaintiff.

J. Giles, Mr. Buttrick, and William D. Sohier, Jr., for defendants.

STORY, Circuit Justice, granted the injunction prayed for in each case. As to the first point, he said, it had been before him in another case, and he then declared, that the affidavit of a single witness, after the lapse of so much time, and after the occurrence of some other circumstances, which were in proof, was not sufficient to outweigh the oath of the patentee, and the general presumption arising from the grant of the letters patent. As to the second point, he said, that, on the fullest reflection, he had come to the opinion, that Mr. Justice McLean was right in his decision (Brooks v. Bicknell [Case No. 1,944]) that an administrator was competent to apply for and receive this grant. That to hold otherwise, would be going contrary to the whole spirit and policy of the patent laws. As to the third point, he said, that he had already decided, after full argument and great consideration, in a case tried in Maine, and not yet reported, that the assignee or grantee, under the original patent, did not acquire any right under the extended patent, unless such right was expressly conveyed to him by the patentee.

In the course of the case, the judge remarked, that he observed that the bills contained a charge of an actual combination to resist the patent. That it was a question of much importance, what would be the legal effect of such a combination. That he did not intend to express any opinion on this part of the case, but that in a former case he had occasion to declare, that it seemed to him that it approached very near, if it did not actually reach, a criminal conspiracy. That, in many cases, it was lawful for individuals to do what could not lawfully be done by a combination. That an individual patentee might successfully resist an individual, but it was much more difficult to resist the combined force of a great number of persons united to oppose a patent.

In the course of the case a question having arisen whether the plaintiff, in patent cases, was required to furnish security for costs,

STORY, Circuit Justice, said: In my circuit the plaintiff in patent cases has never been required to give any security for costs. But I do not recollect any reported case, in which that point was decided.

The following opinion was afterwards written out:

STORY, Circuit Justice. When these cases were heard before me at chambers, I expressed my opinion briefly on the three points made at the argument, not then having time to go into them at large. I do not desire to say any thing further upon the first two points. But the last point involves a question of so much general importance, that it has appeared to me a duty, which I owe to the public, as well as to the parties, to give at large the reasons which influenced my opinion, and governed the decision. I do this the more readily, because I have not been able to find among my papers any statement, reduced by me to writing, of the particular circumstances attending the case in Maine, to which I have already alluded, or any report of the grounds on which that decision was made. If I prepared, after the term, any written opinion (of which I am not certain), it has been mislaid, and after considerable search, I have not been able to find any. I rather think, from my general recollection, that the question arose incidentally upon a renewed patent, granted by a special act of congress, after the first patent had regularly expired, and before the passage of the patent act of 1836 (chapter 357). It may, perhaps, have been in a case involving the validity of the renewed patent, granted by the act of congress of 3d of March, 1835 [6 Stat. 613], to Eastman, for "a new and useful improvement called the 'Circular Saw Clapboard Machine.'" But of this I am not quite sure, and I have not within my reach, at this moment, the means of verifying the conjecture. The doctrine, however, which I then held, was, that every license and assignment under the old laws, before the patent act of 1836, expired with the limitation of the original patent, unless it was expressly, in terms, so granted as to be applicable to any renewal of the patent afterwards; for, otherwise, the licensee's or assignee's right was necessarily bounded by the same limits as that of the licensor or assignee, that is to say, by the original term granted by the patent to the licensor or patentee. The doctrine proceeded upon the plain

ground, affirmed by the common law, that a man can pass by a grant or assignment only that which he now possesses, and which is in existence, at the time, either actually or potentially. His grant or assignment is, therefore, by its natural interpretation, limited to the rights and things which are then in existence, and which he has power to grant, unless he uses other language, which imports an intention to grant what he does not now possess, and what is not now in existence. In the latter case, the language does not even then operate strictly as an assignment or grant, but only as a covenant or contract, which a court of equity will carry into full effect, when the right or thing comes in esse. Thus, it is laid down in Comyn's Digest ("Assignment," cc. 1–3; Id. "Grant" D), and better authority could not be, for, as was well observed by Lord Kenyon, he was the greatest lawyer of his day in all Westminster hall, that an assignment or grant cannot, at law, be of a chose in action, bare right, or possibility. And in a case in Lord Hobart's Reports, it was said, that although a man may, by grant or assignment, assign all the wool then growing on the backs of the sheep owned by him; yet he cannot grant or assign the wool that shall grow upon the backs of the sheep which he shall hereafter buy. Grantham v. Hawley, Hob. 132. And this doctrine was fully recognized by Lord Eldon in the case of Curtis v. Auber, 1 Jac. & W. 526, 532. But I need not dwell on this point, because it came under the full consideration of the court in Mitchell v. Winslow [Case No. 9,673], where the principal authorities were collected and commented upon at large; so that the only remedy for the licensee or assignee, where a grant or assignment has been made to him and his heirs, of a right to a thing not then in existence, but which is to operate in futuro, when the thing is created or comes in esse, is in equity, by way of specific enforcement of a covenant or contract. See 2 Story, Eq. Jur. (3d Ed.) §§ 1040, 1041.

Now, it appears to me, that this doctrine is expressly applicable to licenses and assignments under the patent act of 1836, and, indeed, as I think, a fortiori applicable, because the whole design of the 18th section of the act, providing for renewed patents, is, in terms, exclusively confined to the original inventor, and to be for his sole benefit, and not for the benefit of his licensee or assignee; and, therefore, that section is to receive a correspondent construction in favor of the inventor alone, unless the particular clause of the section, which I shall presently consider, does, by natural or necessary implication, confer the right upon the licensee or assignee.

Let us then, for this purpose, examine the 18th section of the patent act of 1836. It enacts, that, whenever any patentee (not any assignee) shall desire an extension of his patent beyond the term of its limitation, he may make application therefor to the commission-er of the patent office, setting forth the grounds thereof; and then, after prescribing the notice, &c. to be given of the application, it provides, that the secretary of state, the commissioner of the patent office, and the solicitor of the treasury, shall constitute a board to hear and decide upon the evidence produced before them for and against the extension; and the patentee is required to furnish to the board a statement in writing, under oath, of the ascertained value of the invention, and of his receipts and expenditures, sufficient to exhibit a true and faithful account of loss and profit accruing from or by reason of the said invention. The section then proceeds to declare, that "if, upon a hearing of the matter, it shall appear to the full and entire satisfaction of the board, having due regard to the public interest therein, that it is just and proper that the term of the patent should be extended, by reason of the patentee (not the assignee,) without neglect or fault on his part, having failed to attain from the use and sale of his invention a reasonable remuneration for the time, ingenuity and expense bestowed upon the same, and the introduction thereof into use, it shall be the duty of the commissioner to renew, and extend the patent, by making a certificate thereon of such extension, from the term of seven years from and after the expiration of the first term, &c.; and therefore the said patent shall have the same effect in law as though it had been originally granted for the term of twenty-one years." Now, bearing in mind that, at this time no patent could by law issue except to the inventor, and that it was only by the subsequent act of 3d of March, 1837, c. 45, § 6 [5 Stat. 193], that it could be issued to the assignee, we have, at once, a perfect key to the true object and purpose of this 18th section of the act of 1836, that the word "patentee" is used therein as equivalent to "inventor," and that the law looked to him as the sole object of its bounty, and meant to reward him, and him alone, for his time, ingenuity and expense in perfecting his invention.

Another consideration is also important to be borne in mind; and that is, that the 18th section refers solely to applications to be made before the original patent has expired. Indeed, the very proviso to the section contemplated, that the application not only may be, but must be made while the term of the original patent is yet running, and before it has expired; for it expressly declares "that no extension of a patent shall be granted after the expiration of the term for which it was originally issued." Now, keeping this in view, we see, at once, the object of the clause of the same section immediately preceding the proviso. It is in these words: "And the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented to the extent of their respective interest therein." The clause

does not mean to enlarge the right of the assignees or grantees to use the thing patented beyond the extent of the interest originally granted to them. If that interest was, from its nature, or character, or just interpretation, limited to the original term, for which the inventor held the patent, then the assignees and grantees were to have no benefit ultra in the renewed patent. But if the original assignment or grant had expressed in terms, or by just implication conferred on the assignees or grantees a right or interest in the renewed patent, then that interest was to be protected; for it was a possibility, for the benefit of which the assignees or grantees had originally stipulated, and for which they must be presumed to have paid a valuable consideration. In this view of the matter, there would be good sense in the clause, founded upon the actual intentions of the parties to the original assignment or grant, upon a just interpretaton of the language used by them. But what is the consequence of adopting a different interpretation of the clause, and applying it indiscriminately to all cases of grants and assignments of or under the original patent, where no such auxiliary intentions can be deduced from the language of the assignment or grant? Let us suppose the case, where an assignment has been made by the inventor of his whole patent right under his patent for a small, and (comparatively speaking) an utterly inadequate compensation, considering its real value, and this has been forced upon him by embarrassment, or poverty, or public indifference, or his own mistaken estimate of its value (a case by no means uncommon in the history of inventors), could it be for a moment imagined, that the 18th section intended, contrary to its professed object, to benefit, not the inventor himself, but his assignee? That the latter and not the former was to receive the whole profits accruing from the renewed patent? Or, that, in such a case, the inventor would not be entitled to take out a renewed or extended patent? And yet, if the argument be worth any thing, the 18th section applies, as fully to such a case, as it would apply to any other case; and we cannot except it from the pressure of the section, unless we look broadly into the objects, which it purports to accomplish, and limit the language to cases, where the inventor has intended to part, not merely with all his present rights, but prospectively with all the future rights and possibilities which he might acquire by a renewed or prolonged patent. Now, the words of the clause extend to the assignees and grantees of the right, (that is, of the patent. right,) the benefit of the renewal "to the extent of their respective interest therein," that is, of the patent right, and no more. Now, what is the extent of their interest therein? Clearly, upon the principles of the common law, neither more nor less than the assignor or grantor then possessed, and was capable of assigning or granting at the time of the assignment or grant, for to that the language of the grant or assignment must, in reason and good sense, be limited, unless the grantor or assignor has by express words or necessary implication shown a broader intention, an intention not merely to grant or assign the right, which he now possesses, but the possibilities, which he may hereafter acquire. And these are the best grounds to support such a limitation and interpretation of the grant or assignment.

In the first place, the grantor or assignor cannot be presumed to have received any compensation or consideration except for the very thing, and to the very extent, which the language properly indicates. In the next place, no court is at liberty to add to the terms used any meaning beyond their ordinary import, unless there are some supplementary expressions to justify such a construction. In the present case, there is no ground to suppose, that either party contemplated, that the grant, or assignment, or license was to be prolonged beyond the term of the original patent, and there are no words requiring a more expanded interpretation. In the next place, to give such an expanded interpretation, for which the inventor has received no consideration, would be to transfer the bounty intended by the government for the benefit of the inventor, whose genius had brought it out, and brought it to perfection, and who had not received a reasonable remuneration therefor, to the grantee or assignee, who had paid nothing and done nothing to deserve it, but had simply given the quid pro quo to the extent of the right or interest conferred upon him under the existing patent. The inventor may, from necessity or expediency, or otherwise, (as has been already suggested,) have conveyed his whole right and interest under the original patent, for a sum utterly unworthy of its intrinsic value. The grantee or assignee may have grown rich by the success of the inventor, and the inventor himself may be now languishing in poverty. Can it be, that the section, professing to intend a remuneration and bounty to the inventor, should, at the same time, have intended to sweep from him the future profits of the renewed invention? That if he should have parted with the half, or two thirds, or the whole of his rights and interests, under the original patent, he shall be narrowed down to a corresponding part, or excluded from all the profits of the renewed patent? If so, it would be but another sad illustration of the fate of genius, Sic vos non vobis. Besides; we are to recollect, that this section of the act of 1836, is not limited to cases of future patents, or to future grants or assignments thereof; but it applies to past also; and that the language, if applicable at all, reaches to both classes, the past, as well as the future;

and the present case is one of the prolongation of a patent issued long before the act of 1836. So that the section is thus made to apply to a case, where neither party could have contemplated any right of renewal, or any possibility of a future interest therein. The patentee had no right of renewal either in esse or in posse. The whole vested in the exercise of a sound discretion by congress, which it would or might apply singly to the merits of each particular case, as it should be presented to them for consideration.

Now, if we construe the language of this clause with reference to the scope of the antecedent language, and the professed objects of the section, however loose and general it may, at first view, seem to be, it admits of an easy and satisfactory exposition. The rights of assignees and grantees to use the thing patented, and to have the benefit of the renewal, is to be to the extent of their respective interests therein, and no more. If that interest was short of the whole of the original term, for which the patent was originally issued, it is not to reach the renewed term. If it was limited to the extent of the original term, it is still to be bounded by it. But if it is an interest in terms, designed to be coextensive with all the interest, which the patentee now has, or may hereafter acquire, not merely to his present rights in esse, but with his contingent rights in posse, then the section makes that a legal interest, which, otherwise, would be but a mere potential, equitable interest, to be enforced in equity, as a mere right under contract, and not as a fixed, present, vested interest. In this way, the whole structure of the section becomes harmonious with its professed objects, the benefit and remuneration of the inventor, and it saves only those rights in the renewed patent for which the inventor has already secured a compensation, and to which he has voluntarily extended his original grants, and assignments, and licenses to the very terms and intent thereof. Interpret the section in any other manner, and it speaks an intention in one part, which it contradicts or controls in another. It takes from the inventor, what he never intended to part with, and may deprive him in part, or in the whole, according to circumstances, of the reward, which the section seemed so studiously to hold out to encourage his genius and skill, and to reimburse his expenditures.

These are some of the reasons, which have influenced my mind in arriving at the conclusion which I have before stated. If they are erroneous, it will belong to the supreme court to correct the errors, and to adopt a rule, which, adhering to a literal interpretation of the clause, may, at the same time, deprive the inventor of all motives to renew the patent, or make the renewal worthless to him, and injurious to the public.

[For other cases involving this patent, see note to Bicknell v. Todd, Case No. 1,389.]